Okay, we're ready to call our next case, Lopez v. Atty Gen USA. Appellate numbers 17-2146 and 17-3130. We'll hear from the petitioner. Good afternoon. May it please the Court. My name is Christopher Seskelly of National Army Service Center, and along with my co-counsel, Joni Eaton, we are pro bono counsel for the petitioner in this matter, Rene Lopez Ramirez. I will be addressing the Fourth Amendment and jurisdictional issues in this matter, and my colleague, Mr. Eaton, will discuss how this case implicates the suspension clause as well as a possible statutory remedy in this case. I would like to reserve two minutes for rebuttal. That will be granted. This case is about whether the government is free to intentionally violate my client's Fourth Amendment rights in order to detain and deport him from the United States. Counsel, let me ask you a factual question. We have two reinstatement orders here. The second one was issued, I believe, in June, and the motion to reopen was filed before then. The second one was June 8th. The motion to reopen was filed before that. Was the second one a ruling on the motion to reopen? We are unclear of that at this time. The government hasn't made any representation regarding that. We would take the position that our motion to reopen was considered either a statement contesting the original reinstatement determination as a non-citizen subject to reinstatement is able to make under the regulation at 8 CFR 1241.8, or alternatively that our motion to reopen was considered properly a regulatory motion pursuant to 8 CFR 103.5. It hasn't been acted upon? No, we have not received any type of written decision regarding that motion. If that's the case, why didn't you just ask us to remand and get a ruling on that, on that motion to reopen? Because we believe that there are crucial factual issues that still need to be developed in this matter. Well, couldn't it be developed on the motion to reopen where the issue is the egregiousness, what happened, Fourth Amendment, all of those things as to whether the trooper was pretextual. All of those things could be developed, wouldn't they? And in fact, just to follow on that, the government at page 16 of the briefs say the agency could have considered that. So, why didn't you just ask to go back there? Or maybe we should just go back there. We did have some communications with the government about our motion. There was sort of a back-and-forth through a motion to amend the administrative record to include the regulatory motion that we've been referring to, but it seemed as if the government took no interest. They want to stick with their position that that night, if he didn't say, I'll contest, he's out of luck. Your Honor, it does seem that their position is that your sole administrative remedy in the reinstatement context is to bring whatever factual or legal challenges you have regarding the reinstatement process at the moment that that piece of paper is signed. And in our client's situation, that was the very night of his arrest. Right. Do you know why a second reinstatement order was entered? It's been described as a superseding order. Do you know why the second order was entered? It's unclear to us. Do you know the status of – I know there's a collateral application being made as a derivative, I guess, of his spouse's application. I know that there's a – according to your brief, there's a motion for reconsideration of the denial of that application. Do you know the status of that? It remains pending at this time. I tried to follow up on that, but I haven't heard back from the – it's the Vermont Service Center of USCIS that adjudicates those petitions. If there were a Fourth Amendment violation here, why is there not sufficient, say, attenuation to do away with the taint of the violation? Well, in their response – I'm sorry, in their – yeah, their response brief, the government does raise the issue of attenuation, particularly with statements that our client made during the reasonable fear process that is his right to avail himself of sort of apart from the reinstatement process. But our position is that those statements were made in a way that is directly tied to the initial unlawful seizure and detention. But for that – but for the fingerprints, none of this would have happened? Yes, Your Honor. But what about the fact that he was counseled at different stages, eventually was placed in withholding of removal in order to get the benefit of withholding? Obviously, the condition precedent usually is, I concede, removability. And he did that counsel weeks, almost months after the stop. Why isn't that sufficient attenuation? And again, we're assuming for the purpose of this discussion that there is a fact-finding that found a violation of the Fourth Amendment. Those statements were made as part of a process that is really the last opportunity of a noncitizen who has an order reinstated against them to remain in the United States when they have a fear of returning to their country of origin. So I would contend that those statements were made in a rather coercive context where he had been detained from the initial encounter with the state police all the way up until the point that he made those statements in his asylum application. Can you suppress your identity? And once they had his identity, they have a valid order of removal. Your Honor, identity evidence in the case law is sometimes referred to in different ways. Pre-existing immigration file evidence and fingerprint information gathered as a result of an unlawful seizure can be suppressed. You're saying the alien file could be suppressed? There is authorities. In the circuit? In the case United States v. Bali, this court considered whether immigration file evidence could be suppressed. While declining to suppress it in that matter, the court made a finding that they were not dealing with an egregious violation of the Fourth Amendment. So what happens? Let's play this out. Let's assume your argument is egregious Fourth Amendment violation, suppression not only of what happened the night of the event, but his alien file in total. What's the remedy? What relief do you get from that? His status remains still undocumented. So what relief would you be asking for? With a valid order of removal. Right. That can be challenged. His immigration status would still be very precarious in this country. He would have an outstanding removal order, although an executed one, so actually perhaps not outstanding. No, it's not. It's a valid order of removal. He came back in illegally, and so it's considered a valid order of removal. Yes, Your Honor. Even if the statement gets thrown out because of a Fourth Amendment violation he had, it would be reinstated after the fact. The government could do that perhaps if they found independent evidence of his alienage, but relying on the same evidence would not naturally. Are you saying his alien file is suppressed for all purposes in perpetuity? I think that's a little bit beyond this matter. We contend that his alien file should be suppressed as far as the documentation that was in it the night that he was subject to the unlawful seizure. And correct me if I'm wrong, but as a factual matter, it's the fingerprints that matter. Because when he came in, he had so many aliases, and they never would have found – if they didn't have the fingerprints, they wouldn't have found the prior removal order at all. Is that correct? That's correct, Your Honor. In order to reinstate the order, they have to connect the noncitizen to the prior removal order. And because of aliases and because his passport was such that he couldn't have done that. They couldn't have done that. If we're acting on the assumption that the fingerprints could be suppressed, then yes. That's what I'm saying. But so we get the fingerprints suppressed, and we get the reinstatement order nullified because of a Fourth Amendment violation. We slap IHS on the – DHS, whatever – on the hand. And then he wins this victory. He's subject to a removal order. Is he not still? It may not have been reinstated, but they could reinstate him again. Theoretically, they could possibly reinstate against him in the future, but our client would be able to walk free if this evidence was subject to suppression the next day. Walk free because of no detention? Yes. Yes. So it's his detention pending removal right now that you're – you're thinking he wins this, he gets out of detention, and they've got to fine him. Perhaps. I think that's a little bit beyond my knowledge base, how exactly Homeland Security sort of prioritizes the enforcement of the law. If the client undoes the fact that he's subject to a removal order while in this country, then even if the reinstatement has – would be nullified, there could be a further reinstatement. Yes. And if he walks out the door, he could be taken into custody. I think in that hypothetical, Judge Roth, because the evidence had been suppressed – But they know who he is. Yes. But I would contend that any immediate detention following suppression would undoubtedly be relying on similar evidence that was fruit of the poisonous tree from the unlawful seizure that we're talking about. But then your argument is if he's taken into custody one minute after he's released or a year after he's released, you're saying it's all the fruit? Because then you're saying the alien file is suppressed in perpetuity. I think undoubtedly there's a point at which it would become too attenuated. As you said, the attenuation for him is not when he's counseled in other proceedings. Your attenuation is he gets his custody statuses removed from him, and he's free. And once he's free, if he's taken into custody, the process can – I'm sorry. Once he's released from custody, the process could restart. I think that would be a factual question in a subsequent proceeding, whether there was an attenuation issue there or not. I think the closer we get to the original hypothetical suppression, the stronger argument there is that that subsequent enforcement is fruit of the poisonous tree. And I would just like to say our client does have – So as he walks out the door, if they say, who are you? And he says, I am Isadora Aguiar Lopez. Okay, you're subject to an order of removal. Come with us. In that situation, your draw, the new detention would be undoubtedly connected to the prior unlawful detention. Well, because that would be him asking the question, who are you? And it would be his response to that, not anything before, unless he lies to who he is. He would be perhaps subject in that circumstance to a normal sort of enforcement for being an alien in the country without documentation. With a valid order of removal. I think given those facts, because the identity evidence that is undoubtedly not suppressible in terms of Supreme Court jurisprudence is his name and his date of birth, but they would have to establish his alienage through some other evidence, unless he freely gave that up to him, gave that up to this enforcement agent. So they would need more than just his name if we had suppressed the prior evidence, because they wouldn't have in their possession untainted evidence of his alienage. And I would add that our client does have pending immigration relief that would potentially allow him to waive any disability issues related to the prior removal order. Are you talking about the application, derivative application for his spouse? Yes. That's why this is not solely an academic exercise. There's actually relief available for our client at the end of the road here. But that relief is independent of this. You applied for that relief in 2016. Yes. So that's got nothing to do with what happens with respect to this stop in the reinstatement of the removal order. But apart from the visa application, are our client's core rights under the Fourth Amendment? We're not denigrating them in our questioning. We're just trying to assume what happens if you prevail on that point. And I think that's what Judge Roth was alluding to, is we still have a valid removal order. And I think that's where we were going. We'll have you up on the rebuttal. Okay. Thank you. All right. Thank you. Good afternoon, and may it please the Court. My name is Jonah Eaton, and I am co-counsel for the petitioner. And I'm going to be addressing the suspension clause violation at issue in this case in light of this Court's very recent decision in Osorio-Martinez v. Attorney General. And I believe I can also talk a little bit about what we believe is a possible statutory mechanism that might avoid the suspension clause issues. Go ahead. If we were to send this back for a full hearing and adjudication on the motion to reopen, would there be a suspension clause problem? Yes, Your Honor. Why? Right now, because of the procedural posture of this case, Your Honor, sort of an immediate remand would simply place it back in front of ICE. And ICE is not, you know, this is an ICE officer sort of making an administrative decision. They do not have all the tools that either an immigration judge or a district court judge would have in terms of developing a robust record. But your adversary represents in its brief had the petitioner submitted his application to DHS, the agency could have considered his evidence and at least weighed it against the DHS agent's account, et cetera, page 16 of their brief. So the government is saying there is a mechanism through the DHS, not even back to the IJ. So doesn't that – the question that Judge Rendell asked you is the very one I had. Don't we avoid the whole suspension clause problem because even the government concedes there's an avenue to be heard? I wanted to make one more sort of slight clarification about the fact that we have these two reinstatement orders. So again, just to review kind of the timeline here, there was the initial reinstatement order issued the night of his arrest. It must have been, you know, minutes before midnight. There was – we then filed a – and we sort of dual characterized it as both either a motion to reorder – excuse me, a motion to reopen or to consider it as a contestation of a reinstatement of removal. After that came the second reinstatement. And, you know, the reinstatement, even just the form they used on the reinstatement is having considered all evidence on the record, everything submitted, you know, by our client. It's kind of boilerplate, though. Yes, Your Honor, but they were – ICE was in – And they opposed – the government opposed your ability to file that motion. They said he waived all rights that night. There should be some kind of ruling on that or something. I mean, Your Honor, he – you know, this is a man with limited education. He does not speak English. He was, you know, confronted with a form, which I would note also he didn't – he refused to sign, which I think – the language above the signature of the agent that says having considered the substantial evidence. You know, Judge Riddell is simply pointing out, I believe, that's just boilerplate language, too. And the court asked both sides for what's the – what's your position on the status of this motion. And what we didn't get back is we think it's been resolved, if so facto, because there was second reinstatement order. Is that what you're saying? I'm saying that the court can't consider that second motion as considered on the complete record before ICE, which is what the form says, boilerplate or no. The motion to reopen that was opposed. We don't – maybe we remanded to find out whether there were proceedings and what was the thought process behind the denial, I guess, of the motion to reopen, if that's what it was. I mean, you know, I think that second motion can – clearly represents a constructive denial of what we were asking ICE to do. We placed a body of evidence into the record before ICE. We asked them to consider it, and then they, after the fact, issued that second order. Do you have any other explanation why there was a second order? I know this is really your adversary's question. I have none, Your Honor. We don't understand why those two orders were issued. And on the first administrative record in this case, it was only the second order was included. It wasn't until the second administrative order in our second PFR were both orders included. Actually, your second petition for review to our court doesn't have the second order. It doesn't even reference it. Yeah. So it's not there. Yeah. I don't know if that has a jurisdictional problem or maybe not. I don't think so, Your Honor. But I don't understand why those two orders were issued and in the orders that they were. But, you know, I do think that we can hang our hat on the fact that, you know, they had our material in the record such as we could develop it, and then they execute a second order. So that chain of events satisfies from your point of view at least exhaustion, and perhaps you would like us to think that the order that it was decided. Yes, Your Honor. For purposes of your suspension clause. Right.  Thank you. And, again, also, Your Honor, I think this also points to sort of, you know, a larger problem that we're having here is that because of the procedural posture of this case, because he came in through the reinstatement process, and because the constitutional violations we are complaining of happened long after he was ever before an immigration judge, he was before a tribunal that could, you know. Do you mean long before? The violations happened long before? Long after, Your Honor. I'm saying the constitutional violation in the stop was recent, and his past removal order, which is the last time he was in front of the judge, was many, many, many years in the past. The 2005 order, but that's not an order before us. No, indeed. My only point, though, Your Honor, is that what happened that night during that traffic stop has not been properly tested, and that's what raises constitutional issues here. And that because, you know, jurisdictionally, you know, we had to come right before this court, you know, we have not had that, you know, that opportunity to really test these issues. And, again, this court's recent decision in Osario-Martinez, which I would add, we'd be more than happy to provide supplemental briefing on if that would be helpful. I think we're familiar with that case, and I think the position in that case is someone who's got some established ties here has certain benefits. I mean, I think it does a little bit more than that, in that Osario-Martinez dealt with arriving aliens. It dealt with a comparable regulatory and statutory regime, sort of, you know, bypassing most Hague's protections, but actually providing a little bit more than our client got. So unless we can sort of, I think, show a way to a tribunal that, again, can, you know, make factual decisions, can do discovery, can do all of the things that we expect a Hague's court to do in those circumstances, then there's going to be a suspension clause violation. And if Your Honor don't mind, I could talk briefly about sort of our thoughts in that direction, if that would be helpful. Well, you want us to go and send it to a district court, right? Yes, Your Honor. But I think that there's a statutory way to do that, which might avoid a suspension clause violation, and that's just under 2347 of Title 28, actually. So this was, as I recently learned, referred to as the Hobbs Act when it was first passed in the 1960s. And Justice Ginsburg, in a concurring opinion from 1999, wrote, I think, a rather helpful footnote, which the Hobbs Act authorizes a reviewing court of appeals to transfer the proceedings to a district court for resolution of material facts when the agency has not held a hearing and the hearing is not required by law. Sensitive to the constitutional concerns that would be presented by complete preclusion of judicial review, the Attorney General argues that Section 2347B3, on its face, permits transfer to a district court in an appropriate case for resolution of substantial selective enforcement challenges of a final order of deportation. So this is from RIA versus American Arab Anti-Discrimination Committee. And this case gets a little murky because of the various sort of jurisdiction-stripping changes that have happened over the years from, you know, the 96 changes, IRA-IRA and ADPA, and then the REAL ID Act in 2005. But I think the gravamonte of that case was that the petitioners were trying to preemptorily challenge within district court the removal proceedings against them, and they were raising these theories that there was selective prosecution, you know, because of both the religious beliefs and of their ethnicity. So they were raising these constitutional claims. Justice Scalia, when he offered the majority opinion in that case, you know, found that there was clear jurisdiction stripping to actually preclude a removal proceeding in 8 U.S.C. 1252G. However, what I think Justice Ginsburg is sort of informing us is that, you know, at the end of those removal proceedings, of course, one would still have recourse in a court of appeals. And what Justice Ginsburg is reminding us, that under the 2347B mechanism, there is still a way for a court of appeals to get these factual records satisfactorily developed in a court below. And I, you know, obviously did some more looking to see if some other circuit courts have sort of taken this on. I did find one case in the Ninth Circuit, Morgan v. Gonzalez, where, again, I mean, you know, these tend to be fairly rare circumstances generally. But the Ninth Circuit in that case found that where the petitioner was, again, trying to challenge removal based on theories of equitable estoppel and substantive due process, basically this petitioner thought he had made a deal with, I believe it was the Drug Enforcement Agency, that he would be a cooperating witness some 20 years in the past in exchange for not being placed in deportation proceedings. Many years later, when he is, in fact, placed in proceedings, he tries to raise these sort of extra INA kind of remedies to his removal. So outside of, obviously, the immigration law. So in that case, the court actually looked and said, well, should we send it down on 2347B3 grounds, you know, yes or no? And they basically, they actually borrowed a little bit from the habeas statute and said, well, is there a colorable claim of a constitutional violation? So they said in that case they found no, you know, simply because he could provide absolutely no evidence there had ever been, you know, an understanding with government prosecutors in that sort of long, distant proceeding. But they did at least sort of go through the exercise that Justice Ginsburg had suggested in her concurring opinion. All right. Counsel, thank you for your arguments. Thank you very much, Your Honors. Okay. Thank you. Good afternoon, and may it please the Court. Breanna Stripley on behalf of the respondent, the Attorney General. I'd like to start by clarifying some points that I think the Court has some questions on. First and foremost, the reason why the second notice of intent decision was because there was an old A numbers were listed on it. So if you see the difference between the two forms is that it was an updated A number. So this is a case where the petitioner has illegally entered the United States eight times, has been removed eight times, and has illegally reentered nine times, each under a different alias. So many different A numbers have been issued. When petitioner filed his application for the T1 beneficiary with USCIS, usually fingerprints are done there. The USCIS was able to find and kind of unify this whole thing back in 2016, and they generated it under the name he submitted, which is the name that he now says is his real name, the Rene. I believe it's Lou. There's so many. I'm going to take a second here and figure it out. The Rene name that he's using. So basically that was what ended up generating this new A number. And to make sure that all of them fell together and you had all these aliases, that's why DHS issued the second one. The only change was basically that difference. So as a result of that, from your point of view based upon that description, the second reinstatement order cannot be construed as a disposition of that motion to reopen. Therefore, the motion to reopen must be still pending. Why didn't the government ask us to send it back to get that resolved? So I think there's a little bit of an ambiguity as to the timeline. So the petitioner submitted the motion to reopen on May 25th, and then the second notice of intent decision was issued on June 8th. Notably, the petitioner included the wrong A number on the motion to reopen, and that's a big identifier, right? A numbers are basically like Social Security numbers for aliens. It's how we identify them. And it wasn't just a number off. There was a completely incorrect. So there's some ambiguity whether the DHS officers had the correct motion to reopen at the time the June 8th order was issued. Petitioners do say in response to the court's order asking about the status of the motion to reopen that I've notified them about the error in the aliens number so that they were able to correct it, but didn't provide a time. But you filed an objection to the motion to reopen, taking the position that he waived on that night, so too bad. Well, yes, Your Honor, because the motion to reopen, we don't know if that was considered as part of the second order. Well, I'm saying you never got a ruling, did you, on the motion to reopen? That's correct. The motion to reopen, we believe, is a separate motion that's still pending with DHS. Was there an objection to that motion? We have in front of us a motion to supplement our record to include the motion to reopen, which you have opposed, the government's opposed. Correct. Going back to May of 2017, was there an objection, did the government object to that motion to reopen? I don't know that you would have, because it's not that kind of proceeding. So, as far as, if I understand how the process works, there's a motion to reopen that was filed in May of 2017 that has not been resolved, and there has been no opposition to. You know, the motions to reopen will be up for DHS to decide. I'm not sure that the Attorney General and the Department of Justice would weigh in on those. That's up to their inherent authority to decide, and we don't take a position on that. What we're more concerned about is the fact that we're looking at judicial review and exhaustion in the process. And so, in this case, exhaustion is required. Petitioner doesn't contest that. Petitioner's only response is basically that he did contest, and it was through the motion to reopen. But on this record, it's not clear that that's the case, because we don't know if they submitted it in time. But your contention is, is it not, that by failing to check the box the night of his arrest, he failed? He waived rights. He waived all his rights. When you do not contest, you do not have an ability to raise other later claims, in this case, suppression, later on. And so, while they issued the second order, you know, presumably, it wouldn't just be the main right. Because they reissued it, he would have had a second bite at the apple when they reissued the June 9th. I'm sorry, the June 8th second notice of intent. Right? That's the one that's binding now. That's the one that's relevant, is the June 8th. But we don't know that he was present when that was issued, do we? Well, I mean, the 8 CFR 241.8 says, if an officer determines an alien is subject to removal under this section, he or she shall provide the alien with written notice of his or her determination. The officer shall advise the alien he or she may make a written or oral statement contesting the determination. If the alien wishes to make such a statement, the officer shall allow the alien to do so and shall consider whether the alien's statement warrants reconsideration of the determination. So I'm assuming that you're saying, well, that really happened the night of his arrest. Yeah. But I'm assuming you're not contending that that happened on June 8th, are you? Well, yeah, each time that this order is issued, to the extent that they have to offer and ask the alien, do you wish to contest, I would presume with regularity that you would have to do that on June 8th as well. If it happened on June 8th, we know on May 25th, he filed a motion saying, I want to have this all reconsidered. That's correct. But we don't know if that motion was forwarded to the same people adjudicating the June 8th motion in time. We don't. You say in time. In time. Wait a second. If a motion reopens, it's got to be filed within 30 days, right? So we're certainly filed within 30 days of the April 20th. There is actually no timeline because the basis in which petitioners assert that their motions to reopen to DHS are guided, the 103.5, only applies to immigration benefits, not reinstatement. There are no regulatory or statutory provisions guiding motions to reopen. However, DHS has inherent authority to always reconsider its reinstatement orders. Your position is that 8 CFR 103.5 does not apply to the process in which Mr. Lopez went through. Correct. Tell us how we would know that. Because the regulation says motion to reopen be considered in other than special agricultural worker and legalization cases. And then it has subsections that deal with those special cases. Right. If you look at to what section it is, it only applies to basically benefits instead of the reinstatement provisions. Just direct my attention to how would I know that. I believe it's, again, this is something that wasn't briefed, and so I'm kind of happy to submit extra information on this. But this is a purview for DHS to determine its own jurisdiction on the motion to reopen. We're not contesting it right now. There's nothing before this court that the motion to reopen is. That's a decision that DHS has to render, and then 8 PFR, and then the motion to reopen comes before this court. This provision, though, 103.5, talks about motions by service officers. They're able to do it on their own motion. Why would we not construe this as giving the same benefit to a petitioner who is subject to a service action? I would direct the court to a Tenth Circuit case where they, and I can follow up with the court with the information, but it's basically held that it only applies to the benefits as opposed to. I assume that's the case. You said that the DHS officer, nonetheless, would have the discretion to reopen if it chose. Mr. Lopez's counsel filed an application. There's been no ruling on it. Why don't we just send this back to have that adjudicated? Again, it's very akin, if you would, to in the removal proceedings where this court can decide the issue before it's teed up. The motion to reopen is separate, and that he will have judicial review of, but it has not ripened yet. A decision hasn't been rendered on the motion to reopen. So before this court, we can now look at whether or not his prior order of removal is valid, whether it was proper for DHS to reinstate that prior order. So, you know, the first thing is a threshold issue of exhaustion. Do you have jurisdiction? But assuming, go ahead, you're going to say that the night that he was arrested, when he didn't check off the box, that he's waived his rights? Are you going to contend that? It's not a waiver of rights. It's a failure to exhaust, right? You allow an opportunity to contest. You choose not to contest, and then you want to basically what he ends up doing is raising a suppression motion in the first instance. He didn't choose either way. On the second one, it didn't denote that he checked one way or the other. The second one, I have nothing before me that says that that second form, I can't find it right here in the record, but does it have his signature on it? It has writing on it that says refuse to sign, and the handwriting on that is different than the one that's on April 26th, which means that says refuse to sign. Right, that's correct. There's different officers for each one that were, that executed different ones. But in your position, I think this is a drug delivery. And where was he? I mean, he was taken in on that date, and obviously they sat with him in front of there. I don't know if anybody just didn't write that in there at some point. I mean, did they really go find him? And he's in jail somewhere, right? Yes, he's detained. So, you know, and ERO, which is the same subsection of ICE that deals with issuing these orders. I don't know that he refused to sign, quite frankly. I don't know that that's. Well, the regulation content, well, the actual field manual for ERO tells them that when the alien refuses to sign, that they're supposed to write that in in the notation. But if we were to allow any time an alien refuses to sign, prevent the enforcement of it, that would nullify, that would just be a way out for everything. I don't think that's what we're saying. We're talking simply about whether this refusal to sign constitutes a waiver of the ability to raise any challenge to the reinstatement. And is that your position? By way of a motion to reopen the proceeding. And if that is the case, then the suspension clause issue is right before us. Well, the suspension clause issue, if you want just generally to turn to, you know, this court, one, there's a forum before the administrative agency where they do have the opportunity to contest the grounds on which they're going to reinstate the order. If they want, they're allowed to submit evidence. Where is this provided for, submitting evidence? Is this by a motion to reopen? So in the, no, if, for example, in Contra Garcia, they actually had evidence that was submitted. So that's, you know, evidence that this is kind of taken. If the alien has some, it has to be considered as part of the contest. What we have is this provision says he can make a statement. The officer can allow the alien to make a statement. And the, well, you know, we're really dealing with some regulations that are quite bare bones. But if we look to the field manual, it says that any evidence that petitioner submits has to be included and considered and included in the record of proceedings that that officer then prepares. That record of proceeding then gets reviewed by the supervisor who signs below. That should be somewhere in, you know, on the form, say, and if you want to do this, you have a right to do this. You have a right to produce evidence or something. Well, the form does inform them of their rights to contest. You're not allowed to contest. Right, but I believe the form does inform them of their rights, both through the regulation of everything that's possible. And then on top of that, it's explained to them, made sure it's explained to them in their native language. And so there are, you know, the regulations are... You do not have a right to a hearing before an immigration judge. That's correct because it's a... You can make a statement. You do not have a right to a hearing. Because, again, you know, in reinstatement cases, there's already been a removal. They've already gotten a lot of due process. You only have to prove the three elements of reinstatement here. But the situation changes if there has been a Fourth Amendment violation. Yes, but if there is a Fourth Amendment violation, we're not requiring the alien to come in and make a full suppression motion. They just have to alert... Where does he get the opportunity to do that? Well, so this is how this would generally play out, is he would alert... He has to have a minimum, based off of 1252 D1, alert the ICE officer that there's been an issue. Whether that's... He's not a lawyer. He's being called in. Do you want to contest the determination? He refuses. You know, he's not going to sign it because he also doesn't speak English. Well, again, it's read to him in his native language. Proceedings are done in whatever language they speak best. But to your point about, yes, it's... The alien may not be represented, but he has to just at least say something to the extent of, you know, I was unlawfully arrested or I shouldn't have been arrested or my pale white was, you know, whatever the claim is. And just enough to trigger to the agency... How do we know he didn't say any of that prior to the reinstatement order? Because there's no written or, in this case, anything memorialized that he did contest it. And that would have to go in the record of proceedings that DHS prepares. So if that's enough, here's what DHS can do. If there's a Fourth Amendment issue that comes up, and let's say it's bare bones but they flag it, DHS has several options. They can rescind if it's a, you know, it would be rare, but it's possible. They could transfer to a 240 proceedings if they think that an IJ or, you know, the board should get a more fulsome hearing. Or they could say we look at it and we go forward. Then this court, assuming that we go forward with the reinstatement order, gets full judicial review of it. So doesn't it make some sense then to... We have a circumstance where on April 26th he stopped. Reinstatement order is entered where he refuses to sign. It's unclear whether he made any mention about the circumstances at that time. We know that maybe May 4th he makes a comment or maybe subsequent to that about the circumstances of the stop. But we know on May 23rd his counsel submits an affidavit to the deciding officers. May 25th, I believe. May 25th, thank you, counsel. To the deciding officers that, hey, there was a problem with this stop. We don't know if it went to the deciding officers. No, it got submitted to the agency. It was submitted to the agency. Okay, it got submitted to the agency. So less than 30 days after, assuming your CFR provision doesn't apply, he presented this matter. Why shouldn't we send it back to let the deciding officer who made a decision in that proceeding, in the reinstatement proceeding, determine all the things you just mentioned, including whether there should be a remedy? Well, again, the motion to reopen is pending. So they can get this second look at it. I guess the question is should we send it back or dismiss it as premature? Well, they're separate. This is its own independent proceeding that the court can evaluate. Now, if the court is asking should it hold this case in abeyance to wait for the second case, which would be the motion to reopen, and then consolidate the two per the statute which requires it. That motion was filed in 2017. There's been no action on it. Wouldn't it be a little helpful if we facilitate that process by saying, you know, do something, deny the petition right now, dismiss the petition, but have that action? Because in your brief, as I read to your adversary, there is a forum to be heard. You don't tell us what your authority is for that. I'm going to accept it. It came from the government that the agency could consider the evidence way, and you just told us some of the remedies. So does it make more sense to let the expertise of the agency evaluate the circumstances that brought the alien to them and then what the remedy should be? I guess I would just say that the distinguishing factor in this case is if you already have a notice of appeal, and our contention is that he failed to exhaust and contest it. And so, you know, as you admit, there is a forum. If you don't take advantage of that, you don't get jurisdiction in the first place, so it would be futile to keep carrying the case, this portion. And he still has judicial review on the motion to reopen when it is adjudicated. So he's not getting procluded. But really, on your theory, the motion to reopen is moot because he failed to exhaust and he waived. That would be your theory, isn't it? So in this case, it would be that he failed to exhaust it, so the court doesn't have jurisdiction to it. So you're saying that it's still pending is a little bit – your position really is it's out in space and it's moot because he waived and failed to exhaust. I'm not sure I completely understand. Well, you're saying that there is – that this motion – you're saying two things. You're saying he failed to exhaust by not contesting on either of those notice to reinstate forms, right? So by doing that, he's out of luck. Per 8 U.S.C. 1252 D.1, yes. Okay. Then you say, well, the motion to reopen is pending and we await the proceedings on that. But aren't you saying they're going to be thrown out at some point because he failed to exhaust and this 103.5 doesn't apply? I don't know if DHS would necessarily impute the exhaustion to the motion to reopen, for example. If it's a legitimate suppression claim. I guess I'm confused. You're representing DHS? Yes, but I can't speculate as to how they will adjudicate the motion to reopen on what basis they would. And I don't necessarily know whether the 1253 – And you can't state in their position here that it's moot because he failed to exhaust? I just don't know. And I would hate to represent that position and it not be correct. And because the decision hasn't been rendered, it would just be premature on my part to speculate. But what I can say is that the exhaustion argument is germane to this particular case. And the 1252 is the – you know, it's the court of appeals jurisdictions for a petition for review. How that applies to an administrative agency's motion to reopen is unclear. So really, though, to make sure that he doesn't get, you know, sideswiped, if you will, we need to decide whether that – his failure to contest on that form constituted a waiver or an exhaustion. This court needs to evaluate whether or not, you know, he did exhaust, right? And what the court – you know, if the court found that that motion to reopen, that there's enough record evidence that it was filed in time and that it was considered in time, meaning – so on May 25th is when they filed the motion. The second one that we're going by for the notice of intent decision is June 8th. What I – in representing to the court is the record just simply doesn't say because of the error on the alien number and petitioner's representation that ICE had to contact him to figure out, I don't know if that was before the right adjudicatory body by June 8th. So I don't know if that – you know, the record is just simply unclear whether that's before the DHS agent on that time. But with – What's your best argument that his refusal to sign this form constitutes a knowing waiver of all his rights? So on the first form – Or on a different form. Yeah, on the first form where he checks the box, I do not contest. There was an affirmative ability on his part after he was read, you know, that he had the right to do so and that it would be considered. He opted not to. Now, yeah, I think this is really important just to take a step back. He opted not to or he just refused? He affirmatively checked not to contest. So he affirmatively chose not to contest. Drawing one step back just to, like, where we are in these proceedings, you know, these are – Congress's intended reinstatement to be streamlined. So for any of the court's concern about this being more of a bare-bones process, we have to keep it under that umbrella. You know, this is an alien who has been removed multiple times. He's had 240 proceedings twice. So, really, the scope of these is very narrow. But they are afforded an opportunity to contest. He chose not to in the first form. I will admit the second form is less helpful because no box was checked. But that is the, you know, the process that the statutory regime that Congress laid out. These regulations have been blessed by this court in Puente Garcia as being sufficient due process. And so because we went through that and he chose not to contest, that constitutes exhaustion under 1252D1. I would just say that, you know, if this court finds that that was – that motion to reopen was properly in the record, then it should be in the record. And what they submitted on the supplemental could be considered to the courts. The court could find there's a duty to exhaust. He did exhaust and then reach the merits. That's one possibility. We would politely disagree with that. How could we reach the merits of the Fourth Amendment claim without a factual record? How could we reach the merits? How could we reach the merits of the Fourth Amendment claim without a factual record? Right. So that would be if you found exhaustion because of the motion to reopen, then the motion to reopen presumably would be part of the administrative record. But all we would have is the motion to reopen. And we'd have an affidavit, but we don't have a fact finding by anybody. We're a reviewing court. Yeah. We all used to make findings. We don't do that anymore. Much like you did in Puente Garcia was to send it back when there was questions about whether they complied with the reinstatement. If that was the case, the court can do so here. What happens if we – and this will be my last question, and I'll turn it over to my colleagues. What happens if the court were to find an egregious violation, no attenuation, hypothetically if we were to do that. Hypothetically. Right? And what's the remedy that could be obtained by the petitioner? So I would just point that, you know, even if egregious, I think the case law is still unclear about whether or not identity can ever be suppressed. This is not identity. This is fingerprint evidence. And fingerprint evidence was the fruit of – I mean, the source of the whole thing, is it not? That was what petitioner's representation was. The record is just simply unclear. Now, what's very possible is that the name, which is considered identity, and we briefed this in our case, is enough to run through the system to trigger. And because the name has, you know, had been linked previously, because the T1 beneficiary application was 2016, was arrested and happened in 2017, when he gave his Mexican passport with his real name, that was able to generate. That could be also part of the record that's made below exactly what would lead to what, as part of the whole Fourth Amendment violation. Should we send it to the district court, like counsel suggested? Perhaps we could go to a federal fact finder? So we would not disagree that for the purposes of suspension clause analysis, that that safety valve exists under that provision, under B. But it shouldn't be applicable here. And the reason is the standard on that is that it has to be a genuine issue of material fact. So if, and you do get to consider affidavits and pleadings of the party. So even if we were just to consider petitioner's extra record evidence now, in a white most stable term, so accept it all as true, petitioner hasn't demonstrated egregious violations. So there would be no point to transfer the case. But it exists in case the court is concerned about that. How about a contextual traffic stop has been found? I mean, that could be egregious.  Or arguably had a taillight. Is that the norm? Take someone and take them in and arrest them? Well, again, the record, part of it is the record is. I mean, I think the egregiousness could also be challenged on, during the hearing as to exactly what happened here. You mean if this was in the transfer context? Or are you talking about. No, I mean, as part of the district court proceedings. So, yes. Did I just talk about the transfer? Yes. Okay. So, right. But under the actual transfer statute, this court has to make a determination on that first, before it sees whether or not it's. And what's the determination? A genuine issue of material fact. And so. What about a general state of confusion about what happened? Admittedly, this is, it's a problematic case just because of, you know, we have a limited record, which is a product of reinstatement, but is so because it's supposed to be a streamline. But there are obviously added issues in this case with just the record keeping and some ambiguities. I still haven't gotten an answer to my question. About what happens. No problem. What happens if your adversaries, all their arguments are accepted, the evidence comes out the way they say, there was an egregious force amendment violation, and hypothetically the law was such that there would be suppression of the link to who he is. Sure. What happens in a situation where the identity is suppressed? It's the same thing that we talked about, which is, you know, and contemplated in, you know, Lopez Mendoza, which is you just have this continuing violation. All right. And so physically what happens? So the, from a technical point of view, hypothetically a court would grant the petition. It goes back to the agency. The agency cancels the reinstatement order. Is that correct? And then what happens after that? With someone in his status. Yeah, I have to tell you, I'm not completely sure. Because we don't see this very often. But if the reinstatement order was terminated and he gets released, presumably they could pick him back up for any of the myriad of removal orders. As Judge Roth was saying, Travis remains in effect. Several of them do. And so, you know, that's, you know, I'm sure there might be litigation about how soon after they could pick him, whether or not that's severed and, you know, off of that information. But, yes, at some point, particularly when, you know, petitioner is availing himself in other ways to DHS, this seems like it would just be in an inevitable state situation. I understand. All right. Well, thank you. Thank you. And we'll have the petitioner back on the bottom. Your Honors, respectfully, we are wading through genuine issues of material fact in this case. And that's why I just want to reiterate the importance of access to a tribunal that is capable of really doing fact finding. A remand to ICE simply sort of places us back where we were over a year ago when he was first picked up and this determination was first made. Your adversary is representing you could get consideration of evidence and weighing against the agent's account. They're telling me there's another avenue. Well, that evidence, Your Honor, has been before the agency for over a year now. We submitted that in May of 2017. And I'd actually just note, and I can submit 28-J material on this if it's helpful, that we followed the procedure that the, you know, Philadelphia field office has informed the American Immigration Lawyers Association of Philadelphia, you know, how you're supposed to get this which is what we did. We saw your emails. Okay, good. Thank you, Your Honor. But we were following the procedure as it had been explained to us. So, you know, we would submit that, you know, we did everything we were supposed to to get this material in front of the adjudicating officer. And, you know, again, there must be some reasonable time bar to this, too. I mean, they've been sitting on this motion to rescind, which is wrong, but it's not that long for over a year at this point without rendering a matter of what's to keep them from just sitting on it for another year while my client, you know, continues to sit in Cambria County Prison while they continue to consider it. You know, there must be some sort of reasonable end to this decision being made so we can get to the facts of this case. I also wanted to briefly touch on Ponta Garcia. You know, Ponta Garcia, this court did find that, you know, the due process clause was satisfied. There's an important distinction here, though, between many of these other cases and what's before us now, in that in Ponta Garcia there was a complete record of the core legal issue at question. In Ponta Garcia, well, there were some ambiguities about the man's immigration history, but, you know, there had been prior proceedings in that case. So, you know, remaining to ICE made more sense. In this particular case, you know, we have, as I stated before, we have actions of a Pennsylvania state trooper, you know, that occurred, you know, many years past the time he was, you know, last before an adjudicator, you know, that need to be explored. You know, subpoenaed dashboard cameras of, I don't know, I'm actually not sure if state troopers are, you know, wearing vest cameras. You know, even the egregiousness question or the widespread question, which are the two prongs that get us access to the suppression remedy in the immigration context are questions that require factual records and development of fact, which we have not been able to do. But let's say if the government's representation from their brief pans out and they, the DHS officer, can develop a factual record, isn't it just quicker to have them do it because you could get your immigration relief directly if you're successful, which is, as I understand it from your brief, cancellation of the reinstatement order. So it's sort of one-stop shopping instead of going to the district court, having to make findings, unable to opine on anything other than its view about whether there's a Fourth Amendment violation doesn't really give you your immigration relief, which is what you really are anxious to obtain. Yes, Your Honor. I mean, partly I think just as a practitioner, I think I have a level of skepticism that we would, you know, prevail on this matter before ICE. What the government is, in effect, asserting is that an arrestee must make a Fourth Amendment claim that the arresting officer, you know, we're saying that the Pennsylvania State Police and ICE were working in, you know, close cooperation in this matter. And, you know, I don't see how that can comport with due process. I mean, or, and certainly not under the suspension clause, you know, without access to a tribunal where he can develop a factual record, and even if it comes back before Your Honors and we say, you know, look, we can show that, you know, this stop was, you know, was based on his race, that the trooper was acting under no other motivation than to try to get this guy deported without having, you know, reasonable suspicion or probable cause to support either of those decisions. How could the trooper be acting under a motivation to get this guy deported when he didn't know who he was when he stopped the car? Well, Your Honor, I think that that is sort of exactly the danger here. I would actually maybe urge Your Honors to go back and look at Mississippi v. Davis, which was I think the seminal fingerprint suppression case, and that was a criminal investigation in, I think it was 1966 in Mississippi, and there was a dragnet of African Americans throughout the city. There were no warrants were ever issued, and people were just hauled in and fingerprints were collected until they found a match with an employee of the victim of crime. The defendant's fingerprints were at the scene of the crime, and so in that case the suppression of the fingerprint evidence was to deter those kinds of dragnet police tactics. We are seeing that again in sort of the articles we reference in some of our briefing. Well, the alleged facts in this case to me don't indicate any dragnet type operation. There might be a racial profiling operation, but I don't see that the alleged facts indicate any dragnet. Again, Your Honor, in our briefing we do refer to pro publica in Philadelphia Inquirer reporting that identifies this state police barracks as particularly problematic in terms of arresting Hispanics at much higher rates, and some of them they're able to call in ICE and get removal orders. Of course, we also use the Fourth Amendment to protect those of that population who's getting arrested and getting harassed by police, and they're U.S. citizens or they're legal permanent residents. That is why we have the suppression remedy in the first place, Your Honor. And again, I would say that we've been able to sort of gesture in these directions sort of through our briefing and through our attempt in submitting this material to the agency, but without the opportunity to truly develop a record in front of a tribunal, we come here with one arm tied behind our backs, Your Honor. All right. Well, thank you for your argument. Thank you very much, Your Honors. We thank all counsel for their well-argued presentation and their briefing, and we'll take this matter under advisement, and we are concluded for this afternoon.